IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

ANDREA M. HAND                                                      PLAINTIFF

v.                              Civil No. 09-2001

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                      DEFENDANT

## MEMORANDUM OPINION

Plaintiff, Andrea Hand, brings this action under 42 U.S.C. § 405(g), seeking judicial

review of a decision of the Commissioner of Social Security Administration (Commissioner)

denying her claim for disability insurance benefits ("DIB") under Title II of the Social Security

Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). In this judicial review,

the court must determine whether there is substantial evidence in the administrative record to

support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

## I.      Procedural Background

The plaintiff filed her application for DIB on June 25, 2004, alleging an onset date of

November 30, 2002, due to severe trauma to both knees, a mood disorder, severe pain,

headaches, depression, memory and concentration problems, irritable bowel syndrome, chronic

diarrhea, and lower back pain. (Tr. 95-101, 106-110). Her applications were initially denied and

that denial was upheld upon reconsideration. (Tr. 26-45). Plaintiff then made a request for a

hearing by an Administrative Law Judge (ALJ). An administrative hearing was held on June 28,

2006. (Tr. 536-559). On November 17, 2006, the ALJ rendered an unfavorable decision.

However, on April 18, 2008, the case was remanded back to the ALJ by the Appeals Council for

further consideration of the treating source opinions, to obtain evidence from a medical expert,

to further evaluate plaintiff's mental impairment, and to obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base. (Tr. 54-57). A second hearing ensued on June 26, 2008. (Tr. 345-371). Plaintiff was present and represented by counsel.

At this time, plaintiff was 33 years of age and possessed a high school education. (Tr. 77, 362 ). She had past relevant work experience as a certified nursing assistant, cashier, cook helper, housekeeper, and desk clerk. (Tr. 111-118).

On August 27, 2008, the ALJ found that plaintiff's severe trauma to both knees post op and mood disorders were severe, but did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (Tr. 9A). After partially discrediting plaintiff's subjective complaints, the ALJ determined that plaintiff retained the residual functional capacity to perform sedentary work involving no stooping, bending, climbing, kneeling, crouching, or crawling. (Tr. 10A). Further, from a mental standpoint, plaintiff should only perform jobs where the interpersonal contact is routine but superficial, the tasks are no more complex than those learned by experience involving several variables and limited judgment, and little supervision is required for routine tasks, but detailed supervision is required for non-routine tasks. (Tr. 10A). With the assistance of a vocational expert, the ALJ found plaintiff could perform work as a verifying clerk and small parts assembler. (Tr. 13A).

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on December 5, 2008. (Tr. 3, 7-14). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned by consent of the parties. Both parties have filed appeal briefs, and the case is now ready for decision. (Docs. 10, 11).

2

## II.    **Applicable Law**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his or her disability, not simply their impairment, has lasted for at least twelve consecutive months.

3

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

**III.** **Evidence Presented:**

**A.** **Knee Problems & Severe Pain:**

The evidence of record indicates that plaintiff sustained an on-the-job injury in February 1999, when she and another nurse aide were attempting to move a patient and he grabbed them, causing them all to fall. (Tr. 157). Plaintiff's knee twisted, popped, and then "went out." (Tr. 157). Records reveal that she suffered from recurrent patellar dislocation following this injury. (Tr. 161). An MRI also showed chondromalacia of the patella involving the lateral facet of the patellar articular surface, but no evidence of a discrete meniscal or ligamentous tear. She underwent left knee arthroscopic surgery in October 1999. (Tr. 157, 159, 161-162). In November 1999, plaintiff's knee buckled and she fell. Plaintiff later reported right knee pain, stating that she had fallen at home in February 2000 when her left knee again buckled. (Tr. 159). In May 2000, an MRI of the right knee revealed a medial meniscal tear, a lateral meniscal tear,

4

and strain of the quadriceps.  Plaintiff underwent a second arthroscopic surgery on her left knee in May 2000.  She also underwent right knee surgery in August 2000.  (Tr. 157).  On December 11, 2002, Dr. Clint Kirk performed plaintiff's third and final left knee surgery.  (Tr. 141-142).  Dr. Kirk opined that plaintiff's earlier surgeries had failed due to continuing chronic patellar pain.  (Tr. 162).  Plaintiff underwent left knee arthroscopy with distal extensor realignment, vastus medialis obliquus advancement, and osteochondral drilling of the medial femoral condyle in December 2002.  (Tr. 141, 163).  He then diagnosed plaintiff with a grade III chondromalacia crater on the medial aspect of the medial femoral condyle.  (Tr. 163-164).

On December 18, 2002, plaintiff was admitted to physical therapy for her left knee.  (Tr. 218A).  She expressed some soreness in the left knee, but was ambulating with crutches and partial weightbearing.  Quadriceps contraction on the left was poor and she had a passive range of motion in the left knee to 90 degrees.  Plaintiff was instructed in elevation and ankle pumps to assist with fluid dynamics of the left lower extremity and worked with gait training and gait sequencing with crutches.  She tolerated the treatment well.  (Tr. 218A).

On December 26, 2002, plaintiff told her physical therapist that she was returning to California that week and would receive further PT services there.  (Tr. 218).  She stated that she was pleased with her progress.  Progress notes indicate that plaintiff had been seen a total of five times for physical therapy and presented with persisting swelling in the suprapatellar region of the left knee.  The therapist indicated that she had progressed nicely with increased range of motion of the left knee and improved isometric quad set on the left.  Plaintiff had tolerated her treatment sessions well and was independent with home care and home exercise activity for knee range of motion.  (Tr. 218).

5

By February 4, 2003, plaintiff was reporting 50 percent improvement in her pain. (Tr. 139, 163).

On March 6, 2003, plaintiff was cleared to begin active and resistive exercise. (Tr. 217). Her major complaint was of medial left knee pain with increased ambulation and activity, especially for ascending and descending of stairs. Plaintiff conveyed occasional buckling of the left knee with standing and with ambulation. She also had a history of pain in her right knee with plans to have the same procedure performed on it in the near future. The physical therapist noted that plaintiff had considerable weakness in her left lower extremity. (Tr. 217).

On March 31, 2003, Dr. Kirk reported plaintiff's left knee pain relief at between 60-65 percent. (Tr. 138). Plaintiff had started quad strengthening and believed she was making progress, so Dr. Kirk extended her rehabilitation period for another four weeks. (Tr. 138). He noted that she walked without a limp. Dr. Kirk released her to return to work 4 hours a day on light duty, and stated that her employer would contact him with a job description so he could give specific restrictions. (Tr. 138).

On April 4, 2003, plaintiff conveyed left knee pain for no apparent reason. (Tr. 216). Otherwise, she was tolerating physical therapy well with decreased left knee pain. At this time, her left knee active range of motion was within normal limits. Her quad and hamstring strength were also noted to be improved. (Tr. 216).

On April 25, 2003, the physical therapist noted that plaintiff had been seen for a total of twelve outpatient visits. (Tr. 215). She had returned with a new prescription for continued therapy. However, plaintiff was seen only three times with her new prescription. Plaintiff

6

cancelled five consecutive appointments.  When contacted on April 24, she indicated that her physician had released her from his care. (Tr. 215).

In a June 9, 2003 letter, Dr. Kirk recommended that plaintiff be examined by Dr. Chris Deloache to have the screws removed from her last surgery.  (Tr. 136).  On June 17, 2003, Dr. Deloache reported plaintiff was not yet able to return to work and had not yet been released.  (Tr. 148-150).  She still had screws in her knee that would have to come out and remained "temporarily" totally disabled.  He prescribed Celebrex and Lorcet for her continued pain and swelling at the site of her orthopaedic hardware at the tibial tubercle realignment. (Tr. 149-150).  However, at this time, plaintiff was able to achieve full extension and near full flexion of her knee. She had an anatomically tracking patella and crepitants to patellar ballottement. (Tr. 149).

On March 22, 2004, Dr. David Peterson evaluated plaintiff for a qualified medical evaluation regarding her left knee.  (Tr. 156-171).  He also reviewed plaintiff's medical records. Treatment notes indicate that plaintiff and her husband had driven from Arkansas to California so plaintiff could see Dr. Peterson.  Plaintiff stated that she had fallen while at work in 1999, twisting her knee and causing it to give out.  She also reported a subsequent injury, during which her knees gave out.  Dr. Kirk had recommended a carticel autologous cartilage transplant, a very sophisticated cartilage cell transplant procedure done for specific defects in the weightbearing areas of joints.  He was of the opinion this was plaintiff's only hope, short of knee replacement surgery.  Dr. Peterson noted that her current treatment was only medication, including Lorcet, Celebrex, and Soma.  Interesting to him, was the fact that the characteristics of plaintiff's pain had changed in an unexpected and unexplained way, shifting to a different area of the knee.  Dr. Kirk had previously attributed her pain to the medial femoral condyle rather than to the patella

AO72A
(Rev. 8/82)

area and offered no acceptable or cogent explanation for the change in location of her symptoms.

An examination revealed very little pain in the back with no spasms, although she claimed to experience some while in the waiting room.  Range of motion revealed that the back would flex to fingertips at mid-tibia, and extension hurt a bit more than flexion.  She could pick up her shoes from the floor by bending at the knee, however, she squatted only partially claiming increasing discomfort in her knees.  Plaintiff walked with a limp that favored her left leg slightly.  Her left tibial tubercle, previously moved medially, was somewhat tender with screw heads barely felt.  Dr. Peterson believed the pain was from the screw heads.  The range of motion in both knees was full, with flexion at 135 degrees and full extension.  Plaintiff had patellar crepitance that was quite mild in the left knee with flexion and extension, but not in the right knee.  Neither knee displayed any swelling or warmth to indicate inflammation.  Patellar tracking in both knees appeared to have a slight right lateral shift in the right knee and more vertical tracking with the left knee, with its patellar tendon medially displaced.  Plaintiff had significant apprehension sign to quad retraction with the patella restricted, and this was much more so in the left than the right.  She otherwise had stable knees, with a negative McMurray's sign, and no pain simply through active motion of the knees.  Dr. Peterson was of the opinion that plaintiff's current knee problems were not associated with the injury she sustained in 1999, rather were the result of degenerative arthritic changes in her knees on the basis of natural progression.  He did not believe that a procedure on the medial femoral condyle of the knee would likely effect the anterior knee pain that the plaintiff was experiencing and would be of little value in relieving her patellar area pains.  Dr. Peterson concluded that plaintiff would be precluded from climbing, running, jumping, kneeling, and squatting bilaterally, and prolonged standing.  He noted that it

AO72A
(Rev. 8/82)

was unlikely that plaintiff would be able to return to the vigorous walking and lifting that her previous employment involved.  Dr. Peterson concluded that plaintiff was a qualified injured work and should be retrained to a situation where she could avoid the activities previously mentioned.  (Tr. 156-171).

On June 8, 2004, Dr. Kirk indicated that he had previously recommended a carticel transplant, but his recommendation had been "thrown out."  (Tr. 226).  At this point, she still had retained screws from her trulot procedure that were prominent and would likely affect her skin.  She complained of some discomfort over the screws.  Plaintiff was expecting to have those removed.  Since it had been one year since her surgery, Dr. Kirk opined that she was probably no longer a candidate for the carticel transplant.  As such, he was of the opinion that she would need a total knee replacement at some point in her future.  Dr. Kirk stated that he did not do disability ratings, but indicated that he did think plaintiff had some disability, if not near complete disability due to the arthritis of the kneecap and of the medial femoral condyle comprising 2/3 of the knee.  He prescribed Soma and Lorcet and advised her to seek coverage from Worker's Compensation or disability.  (Tr. 226).

On June 18, 2004, in response to questions posed by plaintiff's attorney seeking clarification concerning plaintiff's permanent and stationary date, Dr. Peterson submitted a supplemental report.  (Tr. 154-155).  He noted that plaintiff had undergone further authorized surgery on her left knee consisting of left patellar tendon realignment in December 2002.  In his experience, recovery to become permanent and stationary from this procedure would be approximately six months postoperative.  He stated that the procedure does require time to heal before vigorously instituting physical therapy.  Dr. Peterson was of the opinion that six months

AO72A
(Rev. 8/82)

time should be adequate for this to occur, making her again permanent and stationary in June 2003.  (Tr. 154-155).

On July 20, 2004, Dr. Peterson was asked to review Dr. Kirk's assessment finding that plaintiff's arthroscopy and distal extensor realignment had failed and recommending she undergo a total knee replacement.  (Tr. 151-153).  Dr. Peterson was of the opinion that a total knee replacement was totally inappropriate for someone of plaintiff's age, except for the most severe cases of degenerative or traumatic arthritis in the knee.  Medical records indicated that plaintiff had a grade III or moderate degenerative changes in the medial femoral condyle of the knee.  As such, Dr. Peterson indicated that he would not recommend that plaintiff undergo a total knee replacement, in spite of her continued pain.  He did not believe that plaintiff's arthritis was related to the injury itself.  Dr. Peterson opined that it was a degenerative change based on natural progression of the degeneration.  His impression was that plaintiff's symptoms were really from chondromalacia of the patella which was one of the three compartments of the knee and a total knee replacement for patellar compartment arthritis alone was not a procedure recommended in the treatment of that condition, not even on a nonindustrial basis.  (Tr. 151-153).

On June 23, 2005, Dr. Deloache completed an attending physician's statement.  (Tr. 209-210).  At the top of the document, it indicates that this assessment concerns plaintiff's condition as of December 31, 2004.  Dr. Deloache notes that he first treated plaintiff on June 17, 2003.  Plaintiff was diagnosed with chronic left knee pain status post removal of retained orthopedic hardware.  Her treatment had consisted of anti-inflammatories, pain mediation, and water aerobics.  The doctor indicated that plaintiff's condition was slight, stating that physical activity

10

could be tolerated but her condition would handicap the performance of some activities. Emotional factors were said to contribute to the severity of plaintiff's condition, her impairments were reasonably consistent with the symptoms and functional limitations described in the evaluation, her symptoms were severe enough to interfere with her attention and concentration, and her symptoms were severe enough to affect her ability to tolerate work stress. The doctor indicated that plaintiff would need to take unscheduled breaks during an 8-hour workday and would likely miss more than four days of work per month. However, no explanation was provided for these statements. He then stated that plaintiff could continuously stand for one hour, stand for a total of four hours per day, continuously walk for one hour per day, and walk for a total of two hours per day. The doctor also limited plaintiff to occasional bending, frequent reaching above, and found she could not squat, crawl, climb, stoop, crouch, or kneel. (Tr. 209-210).

On June 29, 2005, Dr. Kirk completed an attending physician's statement concerning plaintiff's condition as of December 31, 2004. (Tr. 227-228). He stated that he had treated plaintiff since 2002 for degenerative joint disease of her knees. Dr. Kirk concluded that plaintiff's condition was moderate in that some physical activity could be tolerated but her condition would cause a marked handicap in the performance of the activity. He indicated that her impairment was reasonably consistent with her symptoms and physical limitations, her symptoms were severe enough to interfere with attention and concentration, her symptoms were severe enough to affect her ability to tolerate work stress, her she would sometimes need to take unscheduled breaks, and she would likely miss more than four days of work per month. Dr. Kirk found that plaintiff could stand continuously for fifteen minutes, stand a total of less than one

11

hour, walk continuously for fifteen minutes, and walk continuously for one hour.  He then indicated that she could occasionally bend, frequently reach above, but never squat, crawl, climb, stoop, crouch, or kneel.  (Tr. 227-228).

In October 2007, Dr. Patrick Fox administered at least two steroid injections into plaintiff's knees.  (Tr. 291-292).  She reported "great relief" from the injection into her left knee. (Tr. 291).  *See Smith v. Shalala*, 987 F.2d 1371, 1374 (8th Cir. 1993) (holding that treating physician's conservative treatment was inconsistent with plaintiff's allegations of disabling pain).

### B.    Mood Disorder/Depression & Headaches:

Records also indicate that plaintiff had been treated for depression since September 1997. (Tr. 164).  However, there is no evidence to indicate that plaintiff sought treatment from a mental health provider or required psychiatric hospitalization.  On July 13, 2004, plaintiff was treated by Renee Walls, a nurse practitioner with Western Arkansas Total Community Health.  (Tr. 204). She noted plaintiff's history of osteoarthritis and indicated that plaintiff was managed by her office for pain.  Plaintiff reported extreme fatigue without any energy for over a month with associated dysthymia and anhedonia.  She also reported daily headaches for approximately one week generalized without any photosensitivity or nausea or any visual disturbances.  Plaintiff indicated that Tylenol had been of no relief.  A physical examination was normal.  Therefore, Ms. Walls diagnosed plaintiff with fatigue more characteristic of depression without suicidal ideations and headaches more characteristic of tension headaches.  She also discussed with plaintiff the possibility that her headaches could be rebound headaches caused by her chronic Lorcet use.  Ms. Walls then prescribed Trazodone, Prozac, and Ibuprofen.  (Tr. 204).

AO72A
(Rev. 8/82)

On August 25, 2004, plaintiff reported feeling somewhat better, but continued to experience problems with dysthymia. (Tr. 203). Her sleep disturbance had resolved with Trazodone, although she continued to feel fatigued. She had reportedly started the Atkins diet and had lost nine pounds in one month. In addition, she stated that she had stopped smoking on August 4. However, plaintiff had not consulted with Western Arkansas Counseling and Guidance Center ("WACGC") for psychotherapy as was previously recommended. Ms. Walls noted that plaintiff was alert and oriented times three, her speech content was appropriate for conversation, she was cooperative with the interview and exam, and her affect was neither elated nor depressed. Ms. Walls diagnosed plaintiff with depression with some improvement. She then increased plaintiff's dosage of Prozac and referred her to WACGC. (Tr. 203).

On May 17, 2005, plaintiff reported increasing dysthymia, anhedonia, difficulty falling and maintaining sleep, fatigue, and irritability. (Tr. 229). She requested a change in Prozac, although she reported discontinuing it six weeks prior. Plaintiff was alert, her speech was content appropriate for conversation, she was cooperative with the interview and exam, and her affect was flat. Ms. Walls diagnosed plaintiff with left otitis media and anxiety and depression without suicidal ideations. She prescribed Zoloft and again recommended that plaintiff seek therapy through WACGC. (Tr. 229).

On June 14, 2005, plaintiff presented to Ms. Walls' office with multiple complaints. (Tr. 196-197). She did report feeling somewhat better since starting Zoloft. However, she complained of frequent headaches one to two times per week localized in the frontal parietal region symmetrical with an intensity of a five to a six on a ten-point pain scale. Plaintiff reported photosensitivity, phonophobia, and nausea. She had tried Tylenol and Ibuprofen to no avail.

13

Plaintiff had also tried Vicodin, which she was using for pain management, but it offered her no significant relief.  On examination, plaintiff was alert and oriented times three, her speech content was appropriate for conversation, she was cooperative with the interview and exam, and her affect was neither elated but was somewhat flat.  Ms. Walls diagnosed plaintiff with anxiety and depressive disorders with no response to SSRI's, headaches more characteristic of migraine disorder, and dyspepsia.  She prescribed Zoloft, Imitrex, and Pepcid.  Ms. Walls requested that plaintiff document the frequency of her headache disorder and its response to Imitrex.  On the way out of the exam room, plaintiff also reported that she had been having increasing loose stools.  Plaintiff was encouraged to make another appointment to address this issue.  (Tr. 196-197).

On June 28, 2005, plaintiff was treated for pharyngitis, dysthymia, and obesity.  (Tr. 212). She reported continued dysthymia and fatigue with no significant relief.  Ms. Walls prescribed Rhinocort, Zoloft, and promoted weight loss.  (Tr. 212).

On September 22, 2005, plaintiff indicated that she had discontinued the Zoloft after approximately three to four months.  (Tr. 211).  She reported no significant improvement with SSRI's, although she continued the Trazodone which had provided significant relief in sleep. Plaintiff stated that she felt less dysthymic with the Trazodone.  On examination, plaintiff was alert and oriented times three, her speech content was appropriate for conversation, she was cooperative with the interview and exam, and her affect was not elated but was neither depressed nor flat.  Ms. Walls diagnosed her with depression without sleep disturbance and prescribed Trazodone.  (Tr. 211).

14

On June 23, 2008, plaintiff underwent a mental diagnostic evaluation with Dr. Patricia Walz. (Tr. 318-322). Plaintiff stated that she had applied for disability due to knee problems, fibromyalgia, migraines, and irritable bowel syndrome. When asked about mental health issues, she reported depression, stating that she was fortunate to be able to get out of bed in the morning. Plaintiff conveyed crying spells, panic symptoms, and occasional suicidal thoughts with no plan. She had no history of psychiatric hospitalization nor had she pursued counseling or psychotherapy. She felt she could not afford it. Plaintiff had been taking Cymbalta for over a year and indicated that it helped a little. Plaintiff reported significant depression related to loss of independence and chronic pain. Dr. Walz diagnosed plaintiff with major depression, recurrent, without psychosis, dependent traits, and assessed plaintiff with a global assessment of functioning ("GAF") score of 45-50. Her social skills were adequate, but she seemed quite dependent on her husband. Her speech was clear and intelligible and her intellectual functioning estimated to be in the average to low average range. Although plaintiff reported problems with concentration and attention at home that interfered with her household chores, she was able to complete her tasks and her speed of information processing was adequate during training. (Tr. 318-322).

On October 1, 2007, plaintiff underwent an MRI of her brain, due to continued migraine headaches. (Tr. 245, 293-297). The MRI was normal, as was an intracerebral MRA. (Tr. 245). By October 15, her headaches were showing improvement. (Tr. 291). In fact, Dr. Fox indicated that her headaches might be the result of ocular eye strain due to her use of the computer to home school her daughter. (Tr. 291). *See Smith*, 987 F.2d at 1374 (holding that treating physician's conservative treatment was inconsistent with plaintiff's allegations of disabling pain).

15

### C.      Other Impairments:

On October 18, 2004, plaintiff complained of continued fatigue. (Tr. 200). Ms. Walls noted plaintiff's history of polycystic ovarian disease and indicated that many of her symptoms could be associated with this. She attempted to refer plaintiff to a local OB/GYN or UAMS Women's Community Clinic in Little Rock, but plaintiff refused due to insufficient funds. (Tr. 200). Records indicate that she continued to experience problems related to polycystic ovarian disease even after the relevant time period had ended. (Tr. 233-241, 248, 259-264

After plaintiff's date last insured, plaintiff also sought treatment for diarrhea and irritable bowel symptoms. (Tr. 279-290, 298-316). A colonoscopy performed in August 2007 was normal. (Tr. 246). Further, plaintiff was treated for kidney stones in January 2007. (Tr. 266-290).

### IV.      **Discussion**:

Plaintiff contends that the ALJ failed to properly consider her subjective complaints; failed to fully address her psychological limitations; failed to properly consider the Attending Physician's statements submitted by her treating doctors; failed to include the opinions of her treating doctors in his RFC assessment; and, failed to incorporate her need for breaks, possible missed days of work, and mental impairments in his hypothetical question to the vocational expert.

### A.      **Subjective Complaints:**

When evaluating the credibility of plaintiff's subjective complaints the ALJ is required to make an express credibility determination detailing her reasons for discrediting the testimony. *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

16

The standard of evaluation is not whether plaintiff experiences pain, but if the pain alleged is intense enough to cause functional limitations. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (holding that the real issue is not whether the plaintiff is experiencing pain, but how severe and whether it prevents her from performing any kind of work).

An ALJ may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.  *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  The ALJ is required to take into account the following factors in evaluating the credibility of a claimant's subjective complaints:  (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions. *See id.*  The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints.  *Masterson v. Barnhart,* 363 F.3d 731, 738 (8th Cir.2004). However, the ALJ need not explicitly discuss each *Polaski* factor. *Strongson v. Barnhart,* 361 F.3d 1066, 1072 (8th Cir.2004).  The ALJ only need acknowledge and consider those factors before discounting a claimant's subjective complaints.  *Id.*  Even so, the ALJ may discount a claimant's subjective complaints if there are inconsistencies between the alleged impairments and the evidence as a whole.  *Dunahoo v. Apfel*, 241 F.3d 1033, 1037 (8th Cir. 2001); *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).

Plaintiff complained of pain in her knees and legs with muscle spasms from her toes to her hips. (Tr. 121).  She indicated that walking, standing, or sitting for too long and climbing stairs caused pain while walking, standing, sitting for too long, grocery shopping, cleaning, and cooking also made her symptoms worse.  Plaintiff stated that she had to sit with her legs elevated

17

or lie down to prevent her knees from swelling.  (Tr. 351-352).  She also testified that the pain

interfered with her ability to sleep and drive.  (Tr. 349-350).  Plaintiff was of the opinion that she

could only stand/walk for ten to fifteen minutes and sit for one hour before the pain occurred.

(Tr. 121).  However, she also testified that her current treatment consisted only of medication,

as her insurance would not pay for a total knee replacement.  (Tr. 348).  At plaintiff's second

administrative hearing on June 26, 2008, plaintiff also alleged that she had undergone five or six

surgeries on her left knee, when in fact she had only undergone three operations on her left knee.

(Tr. 347-348).

In addition, plaintiff reported problems with depression, stating that she did not want to

be around people, was irritable, and experienced crying spells.  (Tr. 122).  Plaintiff testified that

her pain was so severe that she did not want to go anywhere.  (Tr. 354).

Plaintiff also testified to having frequent headaches that interfered with her ability to

function.  (Tr. 352-353).  She stated that she experienced a headache at least every week and

experienced a debilitating headache at least a couple of times per week.  (Tr. 352-353).

However, on her supplemental interview outline, plaintiff reported the ability to care for

her personal hygiene, do the laundry, wash dishes, change sheets, vacuum/sweep (sometimes),

shop for groceries and clothing, go to the post office and bank, prepare meals, pay bills, use a

checkbook, count change, drive, attend church, watch television, listen to the radio, play video

games, play on the computer, and read.  (Tr. 119-123, 321).  Plaintiff told Dr. Walz that she

could shop independently, although she had not been anywhere alone in several years.  She also

testified that she was able to home school her daughter, perform extensive computer work, and

read extensively.  (Tr. 359-362).  *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability

to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor).  Therefore, we find that the ALJ properly determined that plaintiff's daily activities were inconsistent with her subjective complaints of disabling impairment.  Her subjective complaints were also inconsistent with the medical evidence of record.

  **B.**  **Psychological Limitations:**

  We note that plaintiff was both diagnosed with and treated for depression during the relevant time period.  Plaintiff was first treated for depression by Ms. Walls in July 2004 and referred to WACGC for counseling.  (Tr. 204).  Ms. Walls prescribed Prozac.  By August, plaintiff was feeling somewhat better.  (Tr. 203).  Ms. Walls noted that she was alert and oriented, her speech content was appropriate for the conversation, she was cooperative with the interview and exam, and her affect was neither elated nor depressed.  As such, her Prozac dosage was increased and plaintiff was again referred to WACGC.  Plaintiff did not seek further treatment for her depression until after her date last insured and never followed-up with WACGC.  *See Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005) ("A failure to follow a recommended course of treatment . . . weighs against a claimant's credibility."); *See Gowel v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (holding that lack of evidence of ongoing counseling

or psychiatric treatment for depression weighs against plaintiff's claim of disability).   In May 2005, she reported increasing dysthymia and anhedonia. (Tr. 229).  However, records indicate that she had discontinued the Prozac six weeks prior to this appointment. *See Guilliams*, 393 F.3d at 802.  Again, she was alert, her speech was appropriate, she was cooperative, and her affect was flat.  Ms. Walls prescribed Zoloft and urged plaintiff to seek therapy through WACGC.  (Tr. 229).

In June, plaintiff continued to report problems with dysthymia. (Tr. 212).  However, by September, plaintiff had again discontinued her medication. (Tr. 211). *See Guilliams*, 393 F.3d at 802.   She reported no improvement with traditional anti-depressants, but felt some improvement with Trazodone.   Accordingly, plaintiff requested that Ms. Walls prescribe Trazodone.  (Tr. 211).

On January 19, 2005, Dr. Kathryn Gale, a non-examining, consultative psychologist, completed a psychiatric review technique form.  (Tr. 180-195).  After reviewing plaintiff's medical records, she concluded that plaintiff suffered from depression associated with chronic pain.  However, Dr. Gale found that plaintiff's depression resulted in only mild limitations in activities of daily living; maintaining social functioning; and, maintaining concentration, persistence, or pace.  She also noted no episodes of decompensation.  (Tr. 180-195).

A mental diagnostic evaluation conducted in June 2008, revealed that plaintiff had no history of psychiatric hospitalization or outpatient mental health treatment. (Tr. 318-327). *See Gowel*, 242 F.3d at 796 (holding that lack of evidence of ongoing counseling or psychiatric treatment for depression weighs against plaintiff's claim of disability).  At this point, plaintiff had been taking Cymbalta for over a year and reported that it was helping. *Patrick v. Barnhart*,

323 F.3d 592, 596 (8th Cir. 2003) (holding if an impairment can be controlled by treatment or medication, it cannot be considered disabling). Dr. Walz diagnosed plaintiff with major depression, dependent traits, and assessed her with a GAF of 45-50. However, she indicated that plaintiff's GAF was based on plaintiff's subjective reports of suicidal ideations, significant depression, lack of social interaction, and dependency on her husband. *See Hamilton v. Astrue*, 518 F.3d 607, 610 (8th Cir. 2008) (treating physician's opinion does not deserve controlling weight when it is merely conclusory statement and not supported by medically acceptable diagnostic techniques). Dr. Walz went on to state that plaintiff's social skills were adequate, her speech was clear and intelligible, her intellectual functioning fell within the average or low average range, and her speed of information processing was adequate during training. (Tr. 318-327).

According to plaintiff, her failure to seek mental health treatment/counseling was due to a lack of financial resources. However, at the hearing, she admitted that she did not know whether WACGC based its fees on a sliding scale or not. (Tr. 357-358). It seems clear to the undersigned that the plaintiff never even contacted WACGC to determine whether she could obtain treatment. As plaintiff was receiving general medical treatment through a low cost provider, we can not say that she was unaware of the availability of these type services. Accordingly, we do not find that plaintiff's failure to seek mental health treatment or failure to take her medication as prescribed is excused by her financial situation. *See Murphy v. Sullivan*, 953 F.2d 383, 386-87 (8th Cir.1992) (rejecting claim of financial hardship where there was no evidence that claimant attempted to obtain low cost medical treatment or that claimant had been denied care because of her poverty); *Hutsell v. Sullivan*, 892 F.2d 747, 750 n. 2 (8th Cir.1989)

(noting that "lack of means to pay for medical services does not *ipso facto* preclude the Secretary from considering the failure to seek medical attention in credibility determinations.") (internal quotations omitted).

After a complete review of the entire record, we do not find plaintiff's mental impairments to be as limiting as she alleges. While Dr. Walz did assess her with a GAF of 45-50, we note that this assessment was performed several years after plaintiff's date last insured had expired. The record also shows that plaintiff was also able to drive, shop independently (although she stated she did not do this often), home school her daughter, and attend church. (Tr. 320, 322, 360). Further, although plaintiff complained of problems with attention and concentration, she was able to perform extensive computer work and read extensively. Dr. Walz also indicated that plaintiff was able to complete tasks with adequate information processing speed. (Tr. 318-322). Ms. Walls also treated plaintiff on numerous occasions and never noted any symptoms that rose to this level of severity. There is simply no objective evidence to support Dr. Walz's GAF assessment. *See Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006) (ALJ may elect in certain circumstances not to give controlling weight to treating physician's opinion, as record must be evaluated as whole; for treating physician's opinion to have controlling weight, it must be supported by medically acceptable diagnostic techniques and not be inconsistent with other substantial evidence in case record; physician's own inconsistency may diminish or eliminate weight accorded to his opinion). Therefore, we do not find that the ALJ erred in failing to give Dr. Walz's GAF assessment significant weight.

Accordingly we find substantial evidence to support the ALJ's conclusion that plaintiff was restricted to jobs where interpersonal contact is routine but superficial, the tasks are no more

22

complex than those learned by experience with several variables, the use of judgment is within limits, and little supervision is required for routine tasks, but detailed supervision is required for non-routine tasks.

###    C.    Treating physician's statements:

Plaintiff alleges that the ALJ failed to properly consider her two treating doctors' statements of June 2005 that suggest that plaintiff was significantly limited in her capacity to perform work activity. She contends that these physician statements were entitled to significant weight. While the opinion of a treating physician is entitled to substantial weight, it is not conclusive because the record must be evaluated as a whole. *Charles v. Barnhart*, 375 F.3d 777, 783 (8th Cir. 2004). Moreover, "[a] treating physician's opinion is afforded less deference when the medical evidence in the record as a whole contradicts the opinion." *Haggard v. Apfel*, 175 F.3d 591, 595 (8th Cir. 1999).

Here, the ALJ did consider the opinions of Drs. Deloache and Kirk. Although the ALJ indicated that they were prepared outside of the relevant time period and that the doctor's had not treated plaintiff recently, he also found that they were not supported by the overall medical evidence of record. It appears that these two treating physician's treatment notes contradict their statements, their physician statements contradict one another, and their assessments are contradicted by another medical source. While the record indicates that plaintiff underwent three surgeries on her left knee and one surgery on her right knee, in March 2003, she reported a 60-65 percent decrease in her left knee pain. (Tr. 138). Dr. Kirk released her to return to work four hours per day on light duty. He indicated that she would return for a follow-up in four weeks at which time he predicted that she would be released to full duty as tolerated. (Tr. 138). However,

when Dr. Kirk referred her to Dr. Deloache for follow-up appointments concerning the removal

of the screws in her knee, Dr. Deloache stated that plaintiff had not been released to work and

remained "temporarily" disabled until the screws in her knee were removed.  (Tr. 148).  Then,

in June 2003, Dr. Deloache indicated that plaintiff was able to achieve full extension and near

full flexion of the knee.  (Tr. 149).  She had an anatomically tracking patella, was tender as well

as apprehensive to lateral patellar stressing, had crepitants to patellar ballottement, and was also

tender at the tibial tubercle site of her tibial osteotomy with superficial orthopaedic hardware.

(Tr. 149).

In his physician's statement, Dr. Deloache stated that plaintiff's impairment was only

slight, meaning that physical activity could be tolerated but her condition would handicap the

performance of some activities.  (Tr. 209-210).  However, with no explanation, he concluded that

plaintiff would need unscheduled breaks and will likely miss at least four days of work per

month.  Dr. Deloache then stated that plaintiff could continuously stand for one hour, stand for

a total of four hours per day, continuously walk for one hour per day, and walk for a total of two

hours per day. He also limited plaintiff to occasional bending, frequent reaching above, and

found she could not squat, crawl, climb, stoop, crouch, or kneel.  (Tr. 209-210).

However, Dr. Kirk concluded that plaintiff's condition was moderate indicating that some

physical activity could be tolerated but her condition would cause a marked handicap in the

performance of the activity.  (Tr. 227-228).  He, too, without explanation, found that plaintiff

would need unscheduled breaks and would likely miss at least four days of work per month.

Dr. Kirk then concluded that plaintiff could stand continuously for fifteen minutes, stand a total

of less than one hour, walk continuously for fifteen minutes, and walk continuously for one hour.

24

He also indicated that she could occasionally bend, frequently reach above, but never squat, crawl, climb, stoop, crouch, or kneel.  (Tr. 227-228).

Records indicate that plaintiff and her husband, who was also receiving disability benefits, traveled from their home in Arkansas to Dr. Peterson's clinic in California for an examination.  (Tr. 158, 164).  Dr. Peterson noted that the characteristics of plaintiff's alleged pain had changed in an unexpected and unexplained way, shifting to a different area of her knee.  (Tr. 164).  Dr. Kirk had previously attributed plaintiff's knee pain to the medial femoral condyle rather than to the patella area.  He offered no acceptable or cogent explanation for the change of location for her symptoms.  (Tr. 164).  Further, Dr. Peterson concluded that Dr. Kirk's recommendation for total knee replacement was totally inappropriate because plaintiff had only moderate degenerative changes in the medial femoral condyle.  (Tr. 151).  He did not believe that plaintiff's arthritis was related to the injury itself.  Dr. Peterson opined that it was a degenerative change based on natural progression of the degeneration.  His impression was that plaintiff's symptoms were really from chondromalacia of the patella which was one of the three compartments of the knee, and a total knee replacement for patellar compartment arthritis alone was not a procedure recommended in the treatment of that condition, not even on a nonindustrial basis.  (Tr. 151-153).

Further, Dr. Patterson's examination of plaintiff revealed left tibial tubercle tenderness with the screw heads barely felt.  (Tr. 156-171).  He opined that her pain was likely due to the screw heads.  The range of motion in both knees was full, with flexion at 135 degrees and full extension.  Plaintiff had patellar crepitance that was quite mild in the left knee with flexion and extension, but not in the right knee.  Neither knee displayed any swelling or warmth to indicate

25

inflammation. Patellar tracking in both knees appeared to have a slight right lateral shift in the right knee and more vertical tracking with the left knee, with its patellar tendon medially displaced. Plaintiff had significant apprehension sign to quad retraction with the patella restricted, and this was much more so in the left than the right. She otherwise had stable knees, with a negative McMurray's sign, and no pain simply through active motion of the knees. She was also able to pick up her shoes from the floor by bending at the knees and partially squatting. Dr. Peterson was of the opinion that six months time should have been adequate for plaintiff to heal from surgery, making plaintiff permanent and stationary in June 2003. (Tr. 154-155). He concluded that plaintiff should not climb, jump, run, kneel, squat bilaterally, or stand for a prolonged period of time. (Tr. 169). However, Dr. Peterson also found that plaintiff should be retrained to perform work other than the vigorous walking and lifting she performed as a nurse assistant. (Tr. 170-171).

Thus, given the fact that Dr. Deloache's last examination revealed more functionality than did his physician's statement, the fact that Dr. Kirk had recommended plaintiff undergo procedures that were outside the guidelines of mainstream medical consensus and were in conflict with his own treatment notes indicating plaintiff's improvement, that Drs. Kirk and Deloache's physician statements somewhat contradicted one another, and Dr. Peterson's extensive examination indicated that plaintiff's knee was more functional than Drs. Deloache and Kirk alleged, we believe the ALJ properly dismissed their opinions as they were inconsistent with medical evidence as a whole. Although it is clear that plaintiff suffers from some degree of pain and discomfort, she has not established that she is unable to engage in any and all gainful activity. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir.2000) (holding that mere fact that

26

working may cause pain or discomfort does not mandate a finding of disability); *Woolf v. Shalala*, 3 F.3d at 1213 (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled).

**D.     ALJ's RFC determination:**

Plaintiff contends that the ALJ's RFC does not contain all of plaintiff's relevant limitations.  However, the ALJ properly considered the evidence of record and determined, based upon substantial evidence, that plaintiff retained the RFC to perform sedentary work not involving stooping, bending, climbing, kneeling, crouching, or crawling and where the interpersonal contact is routine but superficial with tasks no more complex than those learned by experience with several variables, the use of judgment is within limits, and little supervision is required for routine tasks but detailed supervision is required for non-routine tasks.  RFC is the most a person can do despite that person's limitations.  20 C.F.R. § 404.1545(a)(1).  A disability claimant has the burden of establishing his or her RFC.  *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir.2004).  "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations."  *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).  Limitations resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. § 404.1545(a)(3).  The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question."  *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001).  Therefore, an ALJ's determination concerning a claimant's RFC must be

27

supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).

As previously stated, Dr. Peterson's detailed examination and medical report revealed that plaintiff retained abilities consistent with and supportive of the ALJ's RFC findings.  (Tr. 163-171).  Although limited with regard to climbing, jumping, running, kneeling, squatting bilaterally, and standing for prolonged periods of time, Dr. Peterson concluded that plaintiff was capable of retraining.  Likewise, in November 2004, Dr. Robert Redd, a non-examining, consultative examiner, concluded that plaintiff could lift less that ten pounds frequently and ten pounds occasionally, stand and/or walk 2 hour during an 8-hour workday, and sit 6 hours during an 8-hour workday.  (Tr. 172-179).  Further, Dr. Redd found that plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl.  (Tr. 172-179).  We also note that plaintiff remained capable of home schooling her child, playing video games, and working on the computer.  Clearly, theses tasks show plaintiff's ability to perform work-related activities.  Therefore, we find substantial evidence to support the ALJ's conclusion that plaintiff could perform sedentary work.

The ALJ also incorporated Dr. Walz's report and findings regarding plaintiff's mental limitations into his determination.  As previously stated, Dr. Walz's GAF finding was based on plaintiff's subjective symptoms.  However, the overall medical evidence does not support a finding that plaintiff has severe mental limitations, as is suggested by her GAF.  Instead, the record indicates that plaintiff was able to home school her child, attend church, care for her personal hygiene, and perform household chores.  Plaintiff also told Dr. Walz that she thought she would be able to shop alone, even though she had not done so in a long time.  While we do

not doubt that plaintiff suffers with some depression associated with her pain, we can not say that the evidence supports a finding that plaintiff's depression was disabling. Had plaintiff's mental limitations been as serious as alleged, plaintiff would not be able to perform the daily activities she has reported performing.

### E.   Testimony of the Vocational Expert:

Lastly, plaintiff contends that the ALJ failed to incorporate her need for breaks, missed days, or mental impairments in his hypothetical to the vocational expert. As such, she contends that the expert's testimony does not constitute substantial evidence. Testimony from a VE based on a properly-phrased hypothetical question constitutes substantial evidence. *See Cruze v. Chater,* 85 F.3d 1320, 1323 (8th Cir.1996); *cf. Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir.1994) (when hypothetical question does not encompass all relevant impairments, VE's testimony does not constitute substantial evidence to support the ALJ's decision). The ALJ's hypothetical question needs to "include only those impairments that the ALJ finds are substantially supported by the record as a whole." *Id.* (citing *Stout v. Shalala,* 988 F.2d 853, 855 (8th Cir.1993)); *see also Morse v. Shalala,* 32 F.3d 1228, 1230 (8th Cir.1994).

In the present case, the ALJ asked the vocational expert whether a person of plaintiff's age, education, and past experience, who could perform sedentary work with no stooping, bending, climbing, kneeling, crawling, or crouching and involving only work where the interpersonal contact is routine but superficial, the tasks are no more complex than those learned by experience involving several variables, the use of judgment is within reasonable limits, and routine tasks require little supervision while non-routine tasks required detailed supervision could still perform work that exists in significant numbers in the national economy. (Tr. 365-

367).  The expert indicated that such a person could perform work as a verifying/charge account clerk and small parts assembler.  Clearly, the hypothetical posed to the expert encompasses all of the impairments that the ALJ found were substantially supported by the record as a whole. Based on the evidence before the court, it is not clear to the undersigned that plaintiff would miss more than four days of work per month or would need multiple unscheduled breaks.  It also seems that plaintiff is able to home school her child without difficulty, clearly evidencing her ability to perform some work-related activity.  Therefore, we find the vocational expert's testimony to constitute substantial evidence.

**V.      Conclusion**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision should be affirmed. The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

DATED this 10th day of February 2010.

/s/ J. Marschewski
HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)